IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| DONNA PATTERSON-RUDOLPH,      )<br>                                                      )<br>      Plaintiff,                                  )<br>                                                      )<br>v.                                                   )      CIVIL ACT. NO.  2:08cv883-MHT-CSC<br>                                                      )                          (WO)<br>JACKSON HOSPITAL & CLINIC, INC.,  )<br>*et al.*,                                           )<br>                                                      )<br>      Defendants.                           ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. INTRODUCTION**

The plaintiff, Donna Patterson-Rudolph, a former employee of Jackson Hospital & Clinic, Inc. ("Jackson Hospital"), brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"), and 42 U.S.C. § 1981, alleging that she was discriminated against on the basis of her race (African-American). Specifically, she alleges that she was wrongfully terminated from her employment. The plaintiff names as defendants Jackson Hospital, Gilbert Darrington ("Darrington"), Human Resources Director; and Brandi Kelsey ("Kelsey"), Human Resources Coordinator; and Ashley Boaz ("Boaz"), Physician Practice Director.

Now pending before the court are the defendants' motions for summary judgment. The court has carefully reviewed the motions for summary judgment, the briefs filed in support of and in opposition to the motion, and the supporting and opposing evidentiary materials and concludes that the motions should be granted.

## II.  SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  This standard can be met by the movant, in a case in which the ultimate burden of persuasion at trial rests on the nonmovant, either by submitting affirmative evidence negating an essential element of the nonmovant's claim, or by demonstrating that the nonmovant's evidence itself is insufficient to establish an essential element of his or her claim.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Jeffery v Sarasota White Sox, Inc.,* 64 F.3d 590, 593 (11th Cir. 1995); *Edwards v. Wallace Cmty Coll.,* 49 F.3d 1517, 1521 (11th Cir. 1995).

The burden then shifts to the nonmovant to make a showing sufficient to establish the existence of an essential element of his claims, and on which he bears the burden of proof at trial.  *Id.* To satisfy this burden, the nonmovant cannot rest on the pleadings, but must, by affidavit or other means, set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e).

The court's function in deciding a motion for summary judgment is to determine whether there exist genuine, material issues of fact to be tried; and if not, whether the movant is entitled to judgment as a matter of law.  *See Dominick v. Dixie Nat'l Life Ins. Co.,* 809 F.2d 1559 (11th Cir. 1987).  It is substantive law that identifies those facts which are material on motions for summary judgment.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986); *See also DeLong Equip. Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499 (11th Cir. 1989).

When the court considers a motion for summary judgment, it must refrain from deciding any material factual issues. All the evidence and the inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir. 1990). *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The movant bears "the exacting burden of demonstrating that there is no dispute as to any material fact in the case." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir. 1983).

### III. FACTS

The plaintiff began working for Jackson Hospital as a medical assistant in June 2005. (Defs' Exhs. 2, 3.) Two months later, the plaintiff was assigned additional duties as a floater and received a pay raise. (Defs' Ex. 18.) During an employee evaluation the following year, Boaz, the plaintiff's supervisor, gave the plaintiff the highest score possible with respect to her job responsibilities. (Defs' Ex. 5.) On the evaluation form, Boaz noted that "Donna is a very dependable employee who does whatever it takes to get the job done" and encouraged her to "smile more [with] the patients and doctors and let her very warm personality come across on her first impression [with] all customers – internal and external." (*Id.*) Boaz also noted that the plaintiff's new goal should be to smile more often. (*Id.*)

On August 15, 2007, the plaintiff parked her car in an unpaved employee parking lot. (Pl's Dep., p. 62.) The parking lot was covered in "nothing but rocks." (*Id.*) As she walked to her assigned building, the plaintiff tripped and fell, resulting in "a hole in [her] pants and

3

bloody knees and hands." (Pl's Dep., p. 63.) She sat on the ground for a minute and then walked to work. (*Id*.) After turning on her computer, the plaintiff sent a mobile message to Stephanie Hute ("Hute"), Boaz's assistant, stating as follows:

> Donna Rudolph, Stephanie I fell upon arrival at work while coming out of the parking lot. A large rock was sticking out and I tripped over it. I don't know if I need to report this as an incident. Please let me know of your findings.

(Defs' Ex. 14; Defs' Ex. 36, Pl's Dep., p. 69.) Hute arrived at the plaintiff's work area and asked whether the plaintiff was okay.[1] (Pl's Dep., p. 73.) The plaintiff said, "I'm okay, yeah." (*Id*.) When the plaintiff told Hute that she needed medical attention, Hute advised that she would contact Boaz. (Pl's Dep., p. 71.)

Boaz arrived and asked whether the plaintiff was okay. (Pl's Dep. P. 72.) The plaintiff responded, "No, my knees are really hurting and they are bloody; I have a . . . tear in my pants." (Pl's Dep., pp. 72-73.) At that time, the plaintiff did not tell Boaz that she needed medical attention. (Pl's Dep., p. 73.) When the plaintiff requested that she be allowed to go home, Boaz's "answer was no." (Pl's Dep., p. 78.) The plaintiff completed her shift and left work for the day. (Pl's Dep., pp. 78-80.)

On Thursday, August 16, 2009, the plaintiff returned to work and requested that Boaz arrange for her to receive medical treatment. (Pl's Dep., p. 80.) Boaz told her that she would contact the Human Resources Department to receive approval for a doctor's appointment. (Pl's Dep., p. 81.) On Friday, August 17, 2009, the plaintiff asked Boaz whether she had

---

[1] Hute was also a nurse. (Defs' Ex. 34, Boaz's Affid., p. 3.)

4

received a response from the Human Resources Department and Boaz indicated that she had not. (Pl's Dep., p. 83.)

When she returned to work on Monday, August 20, 2007, the plaintiff sent an e-mail to both Boaz and Hute, in which she stated that "over the weekend she became very stiff and experienced significant edema/pain in [her] knees" and that she was "not feeling much better today." (Defs' Ex. 15; Defs' Ex. 34, Boaz's Affid., p. 5.) Upon receiving this e-mail, Boaz contacted Kelsey and discussed arrangements for the plaintiff to be examined by a doctor. (Defs' Ex. 34, Boaz's Affid., pp. 5-6.) Boaz subsequently gave the plaintiff an on-the-job-injury form and sent her to the office of Dr. Stewart Tankersley, a general practitioner. (Pl's Dep., p. 95.) Human resources personnel also provided the plaintiff with paperwork for workers' compensation. (Defs' Ex. 33, Kelsey's Affid., p. 4.)

Upon examining the plaintiff, Dr. Tankersley diagnosed the plaintiff as suffering from a right knee contusion and provided samples of Celebrex. (Defs' Ex. 16.) Dr. Tankersley also indicated that the plaintiff could return to regular work without restrictions; however, he also noted that the plaintiff should do no lifting/carrying or pushing/pulling.[2] (*Id*.) On Tuesday, August 21, 2007, and Wednesday, August 22, 2007, Boaz assigned the plaintiff to receptionist and clerical duties. (Defs' Ex. 34, Boaz's Affid., p. 6.) On that Wednesday, the plaintiff sent Boaz an e-mail indicating that she disagreed with Dr. Tankersley's determination that she could return to work without restrictions. (*Id*.)

---

[2] Later that day, Dr. Tankersley initialed a notation on the form which stated, "Correction 4 p.m. No Limitations." (Defs' Ex. 16.)

5

Shortly after the plaintiff expressed her dissatisfaction with Dr. Tankersley's opinion, human resource personnel arranged for the plaintiff to be examined by Dr. Charles Hartzog, an orthopaedic specialist. After examining the plaintiff on August 27, 2007, Dr. Hartzog completed a physician's report and diagnosed the plaintiff as suffering from anterior contusions to both knees and patellofemoral pain. (Defs' Ex. 19.) Dr. Hartzog recommended physical therapy and braces and advised that the plaintiff could return to work and perform sedentary duties. (*Id.*) Dr. Hartzog's report was provided to human resources personnel.

Later that day, Boaz and Kelsey met with the plaintiff to discuss her sedentary work restrictions. (Defs' Ex. 34, Boaz's Affid., p. 8.) During the meeting, the plaintiff was asked to sign an accommodation form. (*Id.*) Kelsey explained that Jackson Hospital requires that all employees who return to work with restrictions to sign the form. (*Id.*) The plaintiff requested that a sentence stating that Jackson Hospital would not be liable for any injuries caused by noncompliance with accommodated restrictions be deleted from the form. (*Id.*, pp. 8-9.) She also stated that she did not understand what Dr. Hartzog meant by sedentary duties and that she believed that "if she got up and went to the bathroom this would somehow violate the restrictions imposed on her job duties by Dr. Hartzog." (*Id.*, p. 9.) In response to the plaintiff's request, Dr. Hartzog provided human resources personnel an additional physician's report, in which he diagnosed the plaintiff as suffering from a knee contusion and chondromalacia. (Defs' Ex. 21.) He also noted that the plaintiff "should do only sedentary (sit-down) duties all day. May get up to go to bathroom." (*Id.*) At some point during the meeting, Darrington arrived and explained that the accommodation form is a standard form

used by Jackson Hospital. (Defs' Ex. 35, Darrington's Affid., p. 11.) When the plaintiff refused to sign the form, Darrington ended the discussion. (*Id*.) After this August 27, 2007, meeting, the plaintiff did not return to her assigned job at Jackson Hospital. (Defs' Ex. 35, p. 12.)

Although she did not report to work on August 28, 2007, the plaintiff did meet with Kelsey and Darrington. (*Id*.) Darrington explained that he did not have the authority to change the accommodation form and that he would discuss the problem with his supervisor.[3] (*Id*.) Once again, the plaintiff refused to sign the accommodation form. (*Id*.)

On August 29, 2007, the plaintiff submitted a letter to Darrington and Kelsey regarding "workers' compensation," in which she complained that she disagreed with Dr. Hartzog's assessment that she is able to perform sedentary duties. (Defs' Ex. 22.) Specifically, the plaintiff stated:

> I am to report to work and sit all day long and get up, only to go to the restroom. I advised Dr. Hartzog that I am already experiencing significant stiffness and pain in my knees and that I did not agree with his orders. I advised the only thing that helps them is if I am lying down with my knees elevated; it also reduces the swelling. He made a comment that really concerns me and that is he doesn't know if my knees will ever heal. I asked, I quote: "What do you mean you do not know if I will recover from this injury?" "He replied that he could not guarantee recovery." I advised that I will do everything in my power to get better.

(*Id*.) The plaintiff also set forth the following reasons for refusing to sign a work restriction

---

[3] The record does not include any evidence indicating that Darrington's supervisor or any other Jackson Hospital personnel made any changes to the standard accommodation form.

memorandum: (1) she was not provided a list of sedentary job duties; (2) she was not provided "the assigned temporary job duties attached"; (3) the memorandum was written "in the second or third parties that is none other specified with names of the addressees." (*Id*.) The plaintiff's letter concluded:

> In other words Ashley Boaz and yourself has denied me the right to return to work, because I will not sign a form waiving my right to file any additional reports of injury if occurs as a result of Dr. Hartzog's orders (Pt should do only sedentary (sit-down) duties all day. May get up to go to the bathroom.) I will not waive my rights; this is my health. I know my feelings. It is shameful that I am being denied the right to return to work, not because I refuse to follow the doctor's orders. Matter-of-fact, I took the orders to Stephanie Hute and she advised that I go to check out and answer the phones/check out patients and I did. It was after the meeting that I was asked to clock out and not return until form is signed.
>
> I feel that Dr. Hartzog knows that I will better benefit from elevation of feet and knees, but was reluctant to give me time off of work due to circumstances.

(*Id*.)

On August 31, 2007, Boaz notified Darrington that the plaintiff had not returned to work and recommended that her employment be terminated due to job abandonment. (Defs' Ex. 34, Boaz's Affid., p. 10; Defs' Ex. 35, Darrington's Affid., p. 12.) On September 4, 2007, Darrington wrote a letter which was hand-delivered to the plaintiff, in which he expressed concern about the plaintiff's unwillingness to sign the accommodation form and return to work. (Defs' Ex. 26.) Darrington also stated:

> I must regretfully inform you that we cannot meet the demands you have placed on the Management Team. Due to the position

8

>you have taken in this matter concerning your employment with Jackson Hospital, we must view your unwillingness to return to work as a voluntary resignation. Please understand that we value you as a member of this team however, we must move forward with treating patients.
>
>If you wish to further discuss the possibility of continuing your employment with Jackson Hospital, please contact Mr. Darrington. . . . If you no longer wish to meet with us or follow up concerning this matter, please forward a signed letter of resignation with the effective date to the Human Resources Department. I would also like to thank you for your past efforts.

(*Id.*)

The plaintiff did not contact Darrington. On September 6, 2007, Darrington sent a letter to the plaintiff informing her that "effective September 5, 2007, [her] employment with Jackson Hospital was terminated due to job abandonment."[4]  (Defs' Ex. 29.)

In March 2008, the plaintiff submitted a complaint to the Equal Employment Opportunity Commission ("EEOC"), asserting that she was discriminated against on the basis of her race. On August 1, 2008, the EEOC dismissed her case. The plaintiff filed an initial complaint in this court on November 3, 2008, and an amended complaint on December 10, 2008. (Doc. Nos. 1 & 11.)

---

[4] On September 28, 2007, an administrative law judge for the State of Alabama Department of Industrial Relations Unemployment Compensation Agency determined that the plaintiff was ineligible for benefits because she voluntarily left her job. (Attach. to Doc. No. 39, Pl's Ex. 14.) On appeal of the ALJ's decision, the State of Alabama Board of Appeals determined that the evidence established that the plaintiff did not voluntarily leave her job and reversed the ALJ's decision. (Attach. to Doc. No. 39, Pl's Ex. 15.)

9

## IV. DISCUSSION

The plaintiff contends that she was wrongfully terminated from her employment at Jackson Hospital based on her race. Specifically, she alleges that the defendants treated her differently from white employees by refusing to provide immediate medical attention for her injuries, failing to accommodate her needs concerning the restrictions prescribed by her physicians, and disallowing full Worker's Compensation benefits. The plaintiff asserts that the defendants discriminated against her by asking her to sign an incomplete accommodation form.

Title VII prohibits discrimination on the basis of race, color, religion, sex, or national origin in a variety of employment practices.[5] *See Walker v. NationsBank of Fla., N.A.*, 53 F.3d 1548, 1555 (11th Cir. 1995). In an employment discrimination case, the plaintiff bears the ultimate burden of proving that the defendant intentionally discriminated against her. *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). This Circuit has consistently held that federal courts, in resolving Title VII claims, do not review the accuracy of an employer's decision to terminate a plaintiff's employment. *See*, *e.g.*, *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1321 n.16 (11th Cir. 1998) (citing *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("Title VII is not a shield against harsh treatment at the workplace.")).

---

[5] Title 42 U.S.C.A. § 2000e-2(a)(1) provides: "It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."

To defeat the defendant's motion for summary judgment, the plaintiff must first establish a prima facie case of discrimination by one of three generally accepted methods: (1) presenting direct evidence of discriminatory intent; (2) presenting evidence to satisfy the four-part circumstantial evidence test set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); or (3) presenting statistical proof. *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989).[6] Because the plaintiff has not presented any direct or statistical evidence supporting her claim of intentional discrimination, the court proceeds to determine whether the plaintiff has demonstrated a prima facie case of intentional discrimination.

To the extent that the plaintiff alleges that she was treated differently from other employees, the court construes this claim as a disparate treatment claim. To establish a prima facie case of disparate treatment under Title VII, the plaintiff must show that there were employees, not within her protected class, who were similarly situated, but who were treated more favorably. *See Walker v. Mortham*, 158 F.3d 1177, 1193 (11th Cir. 1998); *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997). The parties do not dispute that the plaintiff is

---

[6] Direct evidence of employment discrimination consists of statements by a person with control over the employment decision "sufficient to prove discrimination without inference or presumption." *See Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir. 1993) (citing *Carter v. City of Miami,* 870 F.2d 578, 581-82 (11th Cir. 1989). The Eleventh Circuit has severely limited the type of language constituting direct evidence of discrimination. *See*, *e.g.*, *Evans v. McClain of Ga., Inc*., 131 F.3d 957, 962 (11th Cir. 1997); *Burrell v. Bd. of Trustees of Ga. Military Coll.*, 125 F.3d 1390, 1393-94 n.7 (11th Cir. 1997); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1082 (11th Cir. 1990). This Circuit holds that a plaintiff presents direct evidence of discrimination where "actions or statements of an employer reflect a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641-42 (11th Cir. 1998); *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997). The plaintiff does not argue that there exists direct evidence of intentional discrimination in this case, nor has she presented any statistical evidence supporting her claims of intentional discrimination.

11

African-American and that she was terminated from her position as a floater. They do disagree, however, as to whether similarly situated persons outside of the plaintiff's protected class received more favorable treatment.

"In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to determine whether the employees are involved in or accused of the same or similar conduct" and are treated differently. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999) (citing *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998) *modified by*, 151 F.3d 1321 (11th Cir. 1998)).[7] The plaintiff must identify similarly situated employees, outside the protected class, who engaged in nearly identical conduct, but received better or more favorable treatment. *See Maniccia,* 171 F.3d at 1368; *Jones,* 137 F.3d at 1311. The question of whether the plaintiff is similarly situated with non-minority employees is crucial. *See Marshall v. Western Grain Co., Inc.*, 838 F.2d 1165, 1168 (11th Cir. 1988) (citing *Kendall v. Block*, 821 F.2d 1142 (5th Cir. 1987)).[8]

The plaintiff alleges that she is similarly situated to one white employee – Debra Boyd. The plaintiff argues that Boyd suffered a similar fall in an employee parking lot and received immediate medical attention. The defendants asserts that Boyd is not a proper comparator because she fell and broke her ankle, requiring emergency medical treatment. After careful

---

[7] The part of this opinion dealing with the establishment of a prima facie case by circumstantial evidence was not superceded by *Jones v. Bessemer Carraway Med. Ctr.,* 151 F.3d 1321 (11th Cir. 1998). Only the part of the Court's opinion regarding direct evidence was superceded.

[8] *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

review, the court concludes that the plaintiff's evidentiary submissions do not create a genuine issue of material fact about whether she was similarly situated to another white employee.

Although both the plaintiff and Boyd tripped over rocks and fell in a parking lot at Jackson Hospital, their situations from this point forward diverge in opposite directions, like a smile and a frown. The evidentiary materials indicate that, as a result of the fall, Boyd fractured her left lateral malleolus and was unable to walk out of the parking lot by herself. The plaintiff, however, merely suffered contusions to her knees and walked to work after the incident.[9] While Boyd's orthopaedic specialist recommended that Boyd should take four days off from work, the plaintiff's orthopaedic specialist determined that the knee contusions would not prevent her from returning to work. The undisputed evidence also indicates that Boyd signed Jackson Hospital's standard accommodation form indicating that she would perform sedentary duties; the plaintiff, however, refused to sign the standard accommodation form. In addition, Boyd returned to work on the day instructed by her doctor and performed sedentary duties, whereas the plaintiff did not return to work and perform sedentary duties as recommended by her physicians. Given the number of dissimilarities, Boyd's fall in the parking lot and the subsequent treatment of her are insufficient to establish that both Boyd and

---

[9] The plaintiff was also diagnosed as suffering from chondromalacia, a degenerative condition. *See also McCastler v. Commissioner of Social Security*, No. 6:07cv1684-Orl-28UAM, 2009 WL 691147 (M.D. Fla. March 16, 2009) (unpublished) ("Chondromalacia is defined as '[s]oftening of any cartilage.' *Stedman's Medical Dictionary* 341 (26th ed. 1995)."); *Mastison v. Astrue*, No. 5:07cv129/RS-MD, 2008 WL 2038250, *5 (N.D. Fla. May 12, 2008) (unpublished) (defining chondromalacia as "meaning degeneration or deterioration in the articular cartridge"); *Carson v. Astrue*, No. 3:07cv60J-32TEM, 2008 WL 899223, *4 (M.D. Fla. March 29, 2008) (unpublished) (defining chondromalacia as "a degenerative disease of the cartilage"). The court notes that there is no evidence that the plaintiff's degenerative condition occurred as the result of her fall in the parking lot.

the plaintiff were similarly situated. Thus, Boyd is not a proper comparator in this case.

> Title VII does not make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal . . . The law does not require, nor could it ever realistically require, employers to treat all of their employees all of the time in all matters with absolute, antiseptic, hindsight equality. What the law does require is that an employer not discriminate against an employee on the basis of the employee's protected class characteristics.

*E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1319 (10th Cir. 1992). After careful review, the court concludes that the plaintiff has failed to demonstrate a prima facie case of discrimination under the disparate treatment theory because she has not demonstrated that she is similarly situated to any individuals outside her protected class who were treated more favorably than her.

Moreover, the defendants have articulated a legitimate, non-discriminatory reason for not providing immediate medical treatment and terminating the plaintiff. Under the second prong of the *McDonnell Douglas* test, the burden shifts to the defendants to present a legitimate, non-discriminatory reason for the plaintiff's termination. *McDonnell Douglas*, 411 U.S. at 802. The Eleventh Circuit holds that "[t]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997). "'The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against

the plaintiff.'" *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 254-55). This intermediate burden is "exceedingly light." *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994).

The defendants contend that the plaintiff did not receive immediate medical treatment after her fall because she walked from the parking lot to work and initially stated that she was "okay." Thus, the defendants have offered a legitimate, non-discriminatory reason for the brief delay of medical treatment after the plaintiff's fall in the parking lot.[10] The defendants also assert that the plaintiff was terminated because she refused to sign a standard accommodation form and failed to report to work for several days. Tardiness or absences are legitimate, nondiscriminatory reasons for terminating an employee. *See Lloyd v. Hi-Ridge Transport*, 396 F.Supp.2d 1290, 1296 (M.D. Ala. 2005).[11] Therefore, the court concludes that the defendants have offered a legitimate, non-discriminatory reason for the plaintiff's termination.

Having determined that the defendants presented evidence of a legitimate, non-discriminatory reason for the plaintiff's delay in medical treatment and termination, the court now turns to the third prong of the *McDonnell Douglas* test. *McDonnell Douglas*, 411 U.S.

---

[10] The plaintiff also asserts that the defendants discriminated against her by refusing to provide her with full Workers' Compensation benefits. (Doc. No. 11, p. 6.) In her amended response, the plaintiff alleges that Boyd received full Workers' Compensation benefits. The plaintiff, however, has failed to provide any evidence in support of this claim or any evidence that the named defendants are responsible for determining to whom Workers' Compensation benefits should be awarded. As already discussed in the body of this Recommendation, Boyd is not a proper comparator, as she fractured or broke a bone during the fall and an orthopaedic specialist recommended that she not return to work for several days.

[11] *Cf. Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648 (11th Cir. 1993) (determining that evidence that employees occasionally made operating errors, were late or absent from work, or showed character flaws satisfied employer's burden of production of legitimate, nondiscriminatory reasons for not giving certain employees pay increases).

15

at 802. The plaintiff must establish that the defendants' justification for the brief delay in medical treatment and her termination was a pretext for discrimination based on her race. Construing the evidence in the light most favorable to the plaintiff, the court concludes that the plaintiff has failed to present substantive evidence that the defendant's reasons for initially failing to refer her to a doctor for medical treatment and terminating her employment were a pretext for racial discrimination.

In evaluating a plaintiff's evidence of pretext, the court is not required to agree with the correctness of the employer's proffered reasons for discharge. This Circuit has consistently held that federal courts, in resolving these types of claims, do not review the accuracy of an employer's decision to terminate a plaintiff's employment. *See e.g., Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1321 n.16 (11th Cir. 1998), *quoting Nix,* 738 F.2d at 1187 ("Title VII is not a shield against harsh treatment at the workplace. . . The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."). Instead, the crucial question is whether the employer was motivated by an improper discriminatory bias. *See, e.g., Standard v. A.B.E.L. Serv., Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998); *Combs*, 106 F.3d at 1538.

In her response, the plaintiff argues that the defendants' articulated reasons for terminating her should not be believed because both Kelsey and Darrington testified during an unemployment compensation hearing that "the only reason for termination was because of the refusal to sign memorandum 08/27/07." (Doc. No. 39, p. 4.) First, the court notes that the

issues presented during a state unemployment compensation proceeding are different from the issues presented in this Title VII case. In addition, the defendants' proffered reasons are not inconsistent with their position in this court. The undisputed evidence indicates that the plaintiff refused to sign the accommodation form. The plaintiff's refusal to sign the standard form indicating that she would perform sedentary duties resulted in her failure to return to work. When the plaintiff was absent from work for several days, she was terminated from her employment. Logically, it follows that if the plaintiff had signed the accommodation form and returned to work, she would not have been terminated. Moreover, even after management gave the plaintiff another chance to meet with Darrington regarding the accommodation form, the plaintiff did not go to this final meeting. There is no evidence indicating that this incident was in any way motivated by an improper discriminatory bias. Consequently, the plaintiff's argument fails to establish that the defendants' proffered reasons were pretextual.

The plaintiff fails to present or direct the court to any evidence establishing that the decision to delay the plaintiff's medical treatment for her bruised knees, require that the plaintiff sign a standard accommodation form, or terminate her was racially motivated. At best, the plaintiff the plaintiff presents nothing more than unsubstantiated allegations and conclusory statements in opposition to the defendants' motions for summary judgment with respect to the discriminatory discharge claim. "[U]nsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). *See, e.g.*, *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (conclusory allegations without specific supporting facts have

no probative value). *See also Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976) (conclusory statements, unsubstantiated by facts in the record, will normally be insufficient to defeat a motion for summary judgment).[12]  This court therefore concludes that the defendants' motions for summary judgment should be granted.[13]

## VI. CONCLUSION

Accordingly, it is the RECOMMENDATION of the magistrate judge that the defendants' motions for summary judgment be GRANTED and that this case be DISMISSED with prejudice.  It is further

ORDERED that the parties are DIRECTED to file any objections to the on or before

---

[12] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[13] In her amended complaint, the plaintiff asserts that the defendants "discriminated and retaliated against [her] when they terminated her employment for refusing to sign a[] document that was incomplete with regard to her injuries and restrictions." (Doc. No. 11, pp. 6-7.)  In her response, the plaintiff argues that the defendants retaliated against her for filing a workers' compensation claim. (Doc. No. 39, p. 12.)  Because the plaintiff's retaliation claim concerning workers' compensation benefits is not raised in her amended complaint, this issue is not properly before the court.  Nonetheless, even assuming the plaintiff had properly presented her retaliation claim, this court concludes that the defendants would be entitled to summary judgment.  To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action;  and (3) there was a causal link between the protected activity and the adverse employment action.  *See Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1336 (11th Cir. 1999); *Wideman v. Wal-Mart Stores*, 141 F.3d 1435, 1454 (11th Cir. 1998).  If a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to produce legitimate reasons for the adverse employment action.  *Brochu v. City of Riviera Beach*, 304 F.3d 114, 1155 (1th Cir. 2002) (citing *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 n. 6 (11th Cir. 2000)). "If the defendant does so, the plaintiff must show that the reasons the defendant gave were pretextual." *Brochu*, 304 F.3d at 1155.  There is no *evidence* before this court indicating that the plaintiff filed a request for workers' compensation benefits.  Thus, it is arguable that the plaintiff did not engage in a protected activity.  In addition, as previously discussed, the defendants have articulated a legitimate reason for terminating the plaintiff's employment and the plaintiff has failed to demonstrate that the defendants' proffered reasons for her termination were pretextual.  The plaintiff has produced no evidence from which a reasonable finder of fact could conclude that her termination was related to any claim for benefits.

August 11, 2009. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 29th day of July, 2009.

                                               /s/Charles S. Coody  
                                           CHARLES S. COODY  
                                           UNITED STATES MAGISTRATE JUDGE